IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Sharon L. Smith, | ) | Civil Action No. 3:03-1927-MJP-JRM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Sisters of Charity Providence Hospitals, | ) | **REPORT AND RECOMMENDATION** |
| Columbia/CSA-HS Greater Columbia Area | ) | |
| Healthcare System, L.P., d/b/a Providence | ) | |
| Hospital, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff, Sharon L. Smith ("Smith"),[1] filed this action against her former employer, Sisters of Charity Providence Hospitals, d/b/a Providence Hospital("Providence"), on June 9, 2003. An amended complaint was filed on March 1, 2004. Smith asserts claims under the Americans With Disabilities Act ("ADA"), the Family Medical Leave Act ("FMLA"), Title VII, pendent claims for breach of contract, breach of contract accompanied by a fraudulent act, and violation of the South Carolina Human Affairs Law. Defendant filed a motion for summary judgment on November 5, 2004. Smith filed an opposition memorandum on January 14, 2005. Defendant filed a reply memorandum on February 3, 2005.[2]

---

[1]Smith is often referred to as "Shay" Smith in the record.

[2]Pretrial matters in this case were referred to the undersigned pursuant to Rule 73.02(B)(2)(g), DSC. Because this is a dispositive motion, this report and recommendation is entered for review by the court.

## Standard for Summary Judgment

When no genuine issue of any material fact exists, summary judgment is appropriate. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. Id. Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues. Ballinger v. North Carolina Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir.), cert. denied, 484 U.S. 897 (1987). This does not mean that summary judgment is never appropriate in these cases. To the contrary, "'the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

In this case, defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir.

1992).  The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment.  Id. and Doyle v. Sentry Inc., 877 F. Supp. 1002, 1005 (E.D.Va. 1995).  Rather, the non-moving party is required to submit evidence of specific facts by way of affidavits [see Fed. R. Civ. P. 56(e)], depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial.  Baber, citing Celotex Corp., supra.  Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits."  Mitchell v. Data General Corporation, 12 F.3d 1310, 1316 (4th Cir. 1993) and DeLeon v. St. Joseph Hospital, Inc., 871 F.2d 1229, 1233 (4th Cir. 1989), n.7.  Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment.  Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987) and Evans v. Technologies Applications & Services Co., 875 F. Supp. 1115 (D.Md. 1995).

## Facts

The following facts are undisputed or stated in the light most favorable to Smith:

1.      Smith is "an African-American woman who is an insulin-dependent diabetic." (Pl. Dep., Ex. 30).

2.      Providence operates two medical heath care facilities (hospitals) in Columbia, South Carolina.

3.      Smith applied for employment with defendant in February of 2001.  At that time, she listed diabetes and high blood pressure as medical conditions. (Pl. Dep., Ex. 20).

4.    Smith was hired as a weekend correspondence clerk on the second shift in the Health Information Management Services Department ("HIMS"), a/k/a Medical Records. (Pl. Dep., p. 83).

5.    Bert Bannon ("Bannon") was Director of Human Resources for Providence. (Bannon Dep., p. 3).

6.    Anne Sharpton ("Sharpton") was Director of HIMS.

7.    Bill Kirkland ("Kirkland") was a manger of the second and third shift operations of HIMS and Smith's direct supervisor at all relevant times.

8.    In April of 2001, Smith was promoted to the position of physician liaison ("PL"). (Pl. Dep., p. 87).

9.    One job requirement of the PL was to perform other duties as needed.  PL's frequently had to perform correspondence clerk duties. (For the "essential functions" of the PL position see Smith Dep., Ex. 22).

10.   On January 17, 2002, Kirkland counseled Smith about an extended personal telephone call, unscheduled absences, productivity, and accurate statistical reports. (Pl. Dep., Ex. 44).

11.   Kirkland left work early on January 21, 2002, and assigned Smith some work he had been performing.  Smith "e-mailed" Kirkland and Sharpton her objections.  She again objected to performing correspondence clerk duties. (Pl. Dep., Ex. 47 and 48).

12.   Sharpton met with Kirkland and Smith on January 24, 2002 to discuss the conflicts that had arisen.  Sharpton stressed team work and the need for Smith to perform duties assigned by Kirkland.  Smith made no mention that her medical condition interfered with her work, but stated (a) requests to perform other HIMS duties, (i.e., correspondence clerk duties) made

4

it difficult for her to prioritize her PL duties and (b) Kirkland's poor planning caused emergencies that she was required to work on. (Pl. Dep., Ex. 25).

13.    Smith had a doctor's appointment on January 31, 2002. She was given a physician's note which stated: "please allow [patient] more flexible work time in order to better manage [diabetes]." (Pl. Dep., Ex. 21 and 50).

14.    On January 31, 2002, Kirkland gave Smith a written reprimand for (a) failure to follow his instructions with respect to performing correspondence duties; (b) arriving late and leaving early on January 29, 2002; (c) failing to follow proper procedure in notifying him of her doctor's appointment that day. Kirkland concluded:

> Correspondence duties, especially requests for patient information, are not to be left unattended by Ms. Smith and there must be immediate improvement in this area to avoid further disciplinary action. I also expect that she will perform all other duties requires, as stated in her job description and follow department and hospital policy, to avoid further disciplinary action.

(Pl. Dep., Ex. 23).

15.    Smith responded in writing to the reprimand addressing each deficiency noted by Kirkland. She did not indicate that she could not perform correspondence duties due to physical limitation. She concluded:

> IT SHOULD ALSO BE NOTED CORRESPONDENCE IS NOT MY RESPONSIBILITY. TO PERFORM OTHER DUTIES AS ASSIGNED IS THE LAST THING LISTED ON MY JOB DESCRIPTION. I WILL ASSIST AS MY PRIMARY DUTIES ALLOW ME TO , BUT AS I HAVE STATED BEFORE…I DO NOT WANT TO DO CORRESPONDENCE. I WANT TO FOCUS ON MY DUTIES AS A PHYSICIAN LIAISON. NO OTHER PHYSICIAN LIAISON DOES CORRESPONDENCE. WE HAVE TO MUCH TO DO WITHOUT ADDED RESPONSIBILITIES. FURTHERMORE, IT WAS TOLD TO MEMBERS OF THE STAFF THAT BILL IS A "WORKING" SUPERVISOR. WHICH MEANS HE

> IS TO PERFORMED [SIC] CORRESPONDENCE DUTIES, PULL FOR
> PHYSICIANS, ANSWER THE PHONE AND WHATEVER ELSE IS
> NEEDED.  THIS IS NOT THE CASE AND OTHER STAFF MEMBERS
> WILL AGREE.

(Pl. Dep., Ex. 24).

16.    Jeff D. Hook, M.D. ("Dr. Hook") gave Smith a note on February 11, 2002 which stated:

> If at all possible, please allow above [patient] to miss work from 2/05/02-
> 3/4/02.  She needs a sabbatical to allow her to focus on her underlying
> health problems as outlined before.

Smith delivered this note to defendant (Pl. Dep., Ex. 51).

17.    Smith submitted a Leave of Absence request to defendant on February 11, 2002. (Smith

Dep., Ex. 39).

18.    On February 15, 2002, Smith filed a claim with defendant's carrier to obtain short term

disability benefits while she was on leave. (Nix Dep., D-170).

19.    Smith became eligible and began FMLA leave on February 19, 2002 (Nix Dep., Ex. D-

126).

20.    During the "sabbatical" Smith faxed Dr. Hook a letter asking for a statement "to extend

my medical leave for a few weeks beyond the March 4th date originally given."  She

indicated that she knew she could be off for twelve weeks under the FMLA.  She also

stated to Dr. Hook: "The primary issue of grievance I have filed against my department

is that of the arbitrary practice of placing additional duties on me that are not part of my

job description as a Physician Liaison.  While in the past I have helped out in other areas

within the department, the additional work load has taken its toll on me physically.  Now

that I won't voluntarily perform those duties any longer my job is being threatened." (Pl. Dep., Ex. 52).

21.     On March 1, 2002, Dr. Hook wrote a "To Whom It May Concern" letter recommending open ended leave for Smith with no return date.  Dr. Hook stated: "I think that this patient would be better served by cutting back on her work hours (she claims she was putting in 60-70 hours per week), have an outlined job description (she claims that she was performing numerous tasks outside of her job description), and allow appropriate time for regularly scheduled meals and frequent blood sugar testing." (Pl. Dep., Ex. 56).

22.     Through these and subsequent efforts, Smith was given an unspecified leave of absence by defendant.

23.     While on sabbatical, Smith was hospitalized with pneumonia and underwent surgery for a hernia on April 17, 2002. (Pl. Dep., Ex. 64).

24.     On May 8, 2002, Dr. Bunch, who had performed Smith's hernia surgery, gave Smith a release to return to work on May 13, 2002 with the following restriction: "Desk work only.  No lifting, pulling, or excessive walking.  Work four days thru 5-17-02." (Nix Dep., Ex. D-150).

25.     Smith presented the release to Marjorie Nix, Providence's Employee Health Nurse.  Id.

26.     Nix informed Smith that the request to return to work with restrictions would not be accepted. (Nix Dep. 87-88, Ex. D-150).

27.     Prior to the week beginning Sunday, May 12, 2002, Kirkland scheduled PL Elaine Smalls to work from 7:00 a.m. through 3:30 p.m. on May 12 and scheduled Smith to return to work on May 14. (Kirkland Dep., Ex. 81).

28.     The week prior to her scheduled return, Smith spoke with Smalls.  Smith agreed to work

        for Smalls on Sunday, May 12, 2002. (Smalls Dep. 47).  No authorization was obtained

        for this switch. (Id. 48).

29.     Smith's father died on May 10, 2002.  (Pl. Dep. 136, 154-55).

30.     Smith worked on May 12, 2002. (Id. 105, 175-76).[3]

31.     On May 12, 2002, Smith e-mailed Kirkland and told him she needed to be out until May

        18, 2002 due to her father's death. (Id. 154-55, 230-32, Ex. 65).

32.     On May 12, 2002, Smith taped a written leave request on Kirkland's door asking for leave

        through May 17, 2002.  Id.

33.     Smith's weekend actions came to light on Monday, May 13, 2002.  Sharpton e-mailed

        Bannon the following:

> I have been speaking with Marjorie Nix and April Chapman concerning
> Sharon (Shay) Smith.  She has not been cleared by her physician to come
> back to work full duty and was told by Marjorie on Friday that we could
> not accomodate [sic] her on light duty.  Shay took it upon herself to come
> in yesterday (Sunday, May 12), clock in at 7:32 a.m. and clock out at 4:12
> pm.  She did this without notifying her supervisor or anyone else in
> management.  Furthermore, we don't know what transpired while she was
> in the department but evidence shows that she did less than 1 hour of work
> during the 8.17 hours that she was here.  We had another Physician Liaison
> on duty all day so we definitely exeeded [sic] our manhours on Sunday.
> We are also in a position where we now have to identify and retrieve the
> records she touched yesterday to check for accuracy, as she hasn't worked
> since January.  At this point I have serious concerns about her loyalty to the
> department and hospital.
> April has stated that fair labor laws require us to pay Shay for 8.17 hours
> on Sunday even though she had not been cleared by her physician, did not
> have permission from management to come in, didn't notify anyone in

_____

        [3]Smith also worked on May 12.  Smalls heard that Smith's father had died and assumed
that Smith would not be available so she also came to work.

> management that she was here, and apparently did little in the form of work while she was here. April stated that employee badges are not deactivated when employees are on leave, however, because of Shay's actions I am requesting that hers be deactivated until she has been cleared to come back to work.
>
> Shay has been written up in the past for similar infractions. She will now be suspended for three days.

(Nix Dep., D 238).

Bannon responded:

> Best way to handle this is to consider that Shay is still on disability leave since she has only been released from her physician for work with restrictions and HIM has declined to offer this "light duty" option to her. Therefore, there is no need to give her any special berevement [sic] or Pto [sic] other then what would ordinarily supplement her 50% disability. She will exhaust her remaining PTO very soon & she has just exhausted her FMLA. We do not need to deal with any work schedule until her Doctor releases her with no restrictions & you can go ahead & put in paperwork for a replacement this week. If we try to suspend her it implies that she has returned to a valid "work status" rather than still being on medical leave. Better to wait until she is released from physician care.
>
> (Id.)

34.    On May 15, 2002, a "Request for Personnel Action" was filed with Human Resources requesting that Smith be replaced as PL because she had "exhausted FMLA" on May 13, 2002. Smith was replaced by Marshelle Hall(an African-American) as PL effective May 19, 2002. (Chapman Dep., Ex. 88 and 89).

35.    On May 13, 2002, Smith returned to Dr. Bunch's office and got an "Excuse Slip" stating that she could return to work on May 12, 2002 with restrictions (Nix Dep., D-147). (Dr. Bunch's earlier note stated Smith could return with restrictions on May 13, 2002 (Nix Dep., D-150).

36.     On May 17, 2002, Dr. Bunch released Smith to return to work without restriction on May

        18, 2002 (Nix Dep., D-146).

37.     On May 22, 2002, Dr. Hook gave Smith a release for work which stated:

> As previously dictated 5/2/02 [patient] should be allowed to return to work
> May 12, 2002. The previously mentioned ADA accommodations should
> be implemented.

        (Nix Dep., D-149).

38.     Smith reported to work on May 18, 2002. She was unable to clock in because her

        identification card had been revoked. (Jones Dep., pp. 38-40).

39.     On May 22, 2002, Smith inquired of Chapman why her PL position had been posted and

        filled. Chapman told Smith that she had not returned to work within the 84 day FMLA

        period (Chapman Dep., pp. 114-15; Smith Dep., Ex. 67).

40.     Smith met with Chapman and Carol Brenner on June 12, 2002. They gave her several

        "Employee Transfer Request Forms" and a copy of current job postings. They advised

        Smith that she could request transfer into open positions. (Smith Dep., Ex. 67).

41.     Smith filed charges of discrimination with the South Carolina Human Affairs Commission

        ("SHAC") on June 24, 2002 and the EEOC on July 1, 2002 (Amended Complaint, Ex. A).

42.     On July 21, 2002, Smith sought transfer to two positions, but the transfers were not

        granted (Smith Dep., Ex. 66, 68, and 69).

43.     Smith applied for unemployment insurance benefits. Defendant responded that Smith had

        not been discharged, but that she had failed to return after her leave of absence. The South

        Carolina Employment Security Commission granted Smith benefits in September of 2002.

        (Chapman Dep., Ex. 91).

10

44.     On May 8, 2003, Smith again sought transfer to several positions but did not gain them.

(Smith Dep., Ex. 75, 76, and 77).

I.     FMLA

Smith alleges that "Providence interfered with and denied Smith her rights under

the Family Medical Leave Act by filing (sic) to reinstate her and terminating her in violation of

29 U.S.C. § 2615." (Amended Complaint, ¶ 50).

"Qualifying employees are guaranteed 12 weeks of unpaid leave each year by the Family

and Medical Leave Act of 1993." Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 84

(2002). "Congress enacted the FMLA in response to growing concerns about 'inadequate job

security for employees who have serious health conditions that prevent them from working for

temporary periods.'" Babcock v. Bellsouth Advertising and Publishing Corp., 348 F.3d 73, 76

(4th Cir. 2003), quoting Miller v. AT&T, 250 F.3d 820, 833 (4th Cir. 2001).

Under the FMLA, eligible employees may take leave "for medical reasons, the birth or

adoption of a child, and for the care of a child, spouse, or parent who has a serious health

condition." 29 U.S.C. § 2601(b)(2). The FMLA provides that eligible employees are entitled

to up to 12 weeks of unpaid leave during any twelve month period, which can be taken by working

a reduced number of hours per day or per week. 29 U.S.C. § 2612(a)(1); 29 U.S.C. § 2611(9).

Leave is permitted when an eligible employee has a "serious health condition" that makes the

employee "unable to perform the functions of the position." 29 U.S.C. § 2612(a)(1). The Act

prohibits employers from interfering with or denying an employee the rights granted by the FMLA

and grants employees a private right of action against employers who violate the Act. 29 U.S.C.

§ 2615(a)(1); 29 U.S.C. § 2617(a). Employees who take leave pursuant to the FMLA are

11

generally entitled to return to the same or equivalent position with the same benefits as they had prior to taking the leave.  29 U.S.C.  § 2614(a)(1).  A serious health condition is defined as involving either inpatient care in a medical care facility or continuing treatment by a health care provider.  29 U.S.C. § 2611(11).

Providence argues that it is entitled to summary judgment because it afforded Smith all her rights under the FMLA.  This argument is premised on the conclusion that Smith failed to return to work within the 84 days FMLA leave period.  The parties agree that the FMLA leave period began on February 19, 2002 when Smith became eligible for FMLA benefits.  Thus, Smith was required to return to work on or before May 14, 2002.

The undersigned finds that in the light most favorable to Smith, she returned to work on May 12, 2002, within the 84 day FMLA leave period.  Providence disputes how much Smith actually worked on that day, argues her return was unauthorized, and that it did not allow her to return with restrictions imposed by her doctors.  However, it is undisputed that Smith did work on May 12 and Providence paid her for that day.  There appears to be an issue of fact surrounding the practice of PL's swapping shifts and whether such a swap needed to be approved.  According to Smalls, this had been done routinely, but the policy had changed and she neglected to seek approval (Smalls Dep., p. 47).  Also, Dr. Bunch released Smith to return to work on May 18, 2002 without restriction. (Nix Dep., D-146).  Smith assumed that the bereavement and PTO leave she had requested would be granted, and she did return to work on May 18.  Smith was not notified that the leave would not be approved prior to her return to work.  There appear to be questions of fact as to why Smith's leave requests were denied including denial because Smith sought to fully exercise her rights under the FMLA.  An employer may not discriminate against

12

an employee because the employee used FMLA leave.  29 U.S.C. § 2615 and 29 C.F.R. § 825.220(c).

II.     ADA

Smith alleges that Providence discriminated against her in violation of the ADA when it failed to accommodate her by removing the correspondence clerk duties and retaliated against her for seeking such accommodation.  Providence asserts that it is entitled to summary judgment because Smith has not shown that she was disabled as defined by the ADA and cannot show retaliation.

Congress passed the ADA "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(2).  The Act provides in part:

> No covered entity[4] shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).  According to the Act the term "discriminate" includes:

> denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant.

42 U.S.C. § 12112(b)(5)(B).  The Act further defines "reasonable accommodation" to include:

> job restructuring, part-time or modified work schedules, reassignment to a vacant position. . . and similar accommodations for individuals with disabilities.

---

[4]Providence has not argued that it is not a covered entity.

13

42 U.S.C. § 12111(9)(B).

Under the ADA, disability is defined as:

(A)     physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B)     a record of such an impairment; or

(C)     being regarded as having such an impairment.

42 U.S.C. § 12102(2). "A physical impairment, standing alone, is not necessarily a disability as contemplated by the ADA. The statute requires an impairment that substantially limits one or more of the major life activities." Dutcher v. Ingalls Shipbuilding, 53 F.3d 723, 726 (5th Cir. 1995). "Major life activity" is defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2 (i). "Substantially limits" is defined as:

(i)     Unable to perform a major life activity that the average person in the general population can perform, or

(ii)    Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2 (j)(1). The ADA regulations specify three factors relevant in considering whether an impairment substantially limits a major life activity: "(i) [t]he nature and severity of the impairment; (ii) [t]he duration or expected duration of the impairment; and (iii) [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2); see also Bolton v. Scrivner, 36 F.3d 939, 943 (10th Cir. 1994), cert. denied, 513 U.S. 1152 (1995).

14

A.     Failure to Accommodate

A plaintiff must establish four elements by a preponderance of the evidence in order to make out a prima facie case for failure to accommodate a disability under the ADA: (1) she was an individual who had a disability within the meaning of the statute; (2) her employer had notice of his disability; (3) with reasonable accommodation she could perform the essential functions of his position; and (4) her employer refused to make such accommodations.  See Rhoads v. F.D.I.C., 257 F.3d 373, 387 n. 11 (4th Cir.2001), cert. denied, 535 U.S. 933 (2002).

The issue before the court is whether Smith's diabetes is a physical impairment which substantially limits one or more major life activity.  Since diabetes is certainly a physical impairment, Smith must show that her diabetes substantially limits a major life activity.[5]  The determination of whether an employee is disabled is an individualized inquiry, particular to the facts of each case.  Sutton v. United Air Lines, Inc., 527 U.S. 471, 483 (1999). Smith does not specify an affected major life activity in her amended complaint.  In a footnote in her opposition brief, Smith makes the following argument:

> The Hospital argues later that Smith has presented no evidence that her diabetic condition causes her to suffer a substantial limitation in a major life activity.  This position is meritless.  Smith testified throughout her deposition about the innumerable ways diabetes negatively affects virtually every area of her life.  See, e.g., Smith Depo. 149, 190.  Smith's ability to care for herself is significantly diminished because her body cannot ward off or recover from illness, infection, and fatigue.  Moreover, Smith suffers from diabetic neuropathy, retinopathy, and proteinuria all of which produce symptoms that greatly impact her ability to conduct all of life's major activities.  Smith Depo. Ex. 31, 32, 35, 37, 41, 50, 53.

---

[5]While Smith may have a "serious health condition" under the FMLA, it does not follow that she has a "disability" under the ADA.  Id. n 12.

15

Review of the cited deposition testimony and exhibits does not establish that Smith's diabetes substantially limits a major life activity. The only specific major life activity cited by Smith is her ability to care for herself. She only argues that her "ability to care for herself is significantly diminished because her body cannot ward off or recovery from illness, infection, and fatigue." But, Smith does not point to evidence to show how this translates into any aspect of her ability taking care of herself. See Dutcher, 53 F.3d at 726 (recognizing that those abilities include feeding, driving, grooming, carrying groceries, washing dishes, vacuuming, and picking up trash). See also, Jacques v. Dimarizo, Inc., 200 F.Supp.2d 151, 157-58 (E.D.N.Y. 2002), *aff'd in part, rev'd in part*, 386 F.3d 192 (2nd Cir. 2004) (ability to care for oneself includes the ability to take care of home, have a normal social life and attend to personal hygiene).

Smith's scattergun argument that her impairments "produce symptoms that greatly impact her ability to conduct all of life's major activities" is unavailing. The exhibits to which she refers are physician notes which discuss her conditions and symptoms, but none of them show that Smith is substantially limited in any major life activity. In essence, Smith is simply relying on her pleadings and has not produced sufficient evidence on this issue.

Providence also argues that Smith cannot show that she was disabled because she did not follow her doctors' instructions about losing weight, exercising and controlling her diet. In evaluating whether an individual is substantially limited in a major life activity, courts are to consider mitigating measures, such as medication, and their positive and negative impact on the activity. See Sutton v. United Airlines, 527 U.S. at 491; Murphy v. United Parcel Serv., Inc., 527 U.S. 516, 521 (1999) (plaintiff not substantially limited in any major life activity because high blood pressure was completely controllable with medication); see also Tangires v. Johns Hopkins

16

Hosp., 79 F.Supp.2d 587, 595 (D.Md.2000) (finding that where asthma is "correctable by medicine" it does not substantially limit a major life activity).

All the records cited by Providence show that Smith was non-compliant with her doctors' directives concerning her conditions. Those directives were designed to better control her diabetes so that the symptoms about which she complained would be less severe.

Providence is entitled to summary judgment because Smith has not shown that her diabetes substantially limits a major life activity, and she was non-compliant with her doctors' recommendations at the relevant times.

B.    Retaliation

The ADA prohibits retaliation against an employee who seeks to assert his rights. Title 42 U.S.C. § 12203(a) states "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this chapter." Title VII precedent is applicable to ADA cases. Fox v. General Motors Corp., 247 F.3d 169, 176 (4th Cir. 2001). A retaliation claim may remain viable even through the ADA claim may be lost.

To establish a prima facie case of retaliation, it must be demonstrated that:

(1)    the employee engaged in protected activity;

(2)    the employer took some adverse employment action against the employee; and

(3)    a causal connection existed between the protected activity and the adverse action.

17

See Von Gunten v. Maryland, 243 F.3d 858, 863 (4th Cir. 2001); Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998); Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994).   If the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence of a legitimate, non-discriminatory reason for the adverse action.  Texas Dep't of Community Affairs v. Burdine, 450 U.S. at 254. If the defendant meets this burden, the plaintiff must show by a preponderance of the evidence that the proffered reason was pretextual, and that his termination was motivated by discrimination.  Reeves v. Sanderson Plumbing Prods., Inc., supra; see also Duncan v. Commonwealth of Virginia Dep't of Corrections, 9 Fed. Appx. 236, 2001 WL 565672 (4th Cir. May 25, 2001)(unpublished).

Smith asserts that she engaged in a protected activity when she requested an accommodation that she not be required to perform correspondence clerk duties due to her diabetic limitations.  She further asserts that she suffered adverse employment actions when Providence failed to reinstate her and refused to consider her for other positions.  Last, Smith asserts that the temporal proximity of the actions of Providence to her protected activity is sufficient to establish causation. (Pl. Mem., p. 17).

Providence argues in its original memorandum in support of summary judgment that Smith cannot establish a prima facie case of retaliation. (Def. Mem., p. 18).  However in its reply memorandum, Providence appears to concede that Smith has established a prima facie case, but she cannot show that its reason for failing to reinstate Smith, reliance on its FMLA interpretation, was pretextual. (Reply Mem., pp. 7-8).  The undersigned concludes that Smith has established a prima facie case of retaliation under the ADA.  The undersigned further concludes that a

18

reasonable jury could find that Providence's reliance on the FMLA is a pretext for discrimination based on the above discussion of Smith's FMLA claim.

    III.    Title VII.

        A.    Disparate Treatment

        In her third cause of action, Smith asserts that "Providence discriminated against [her] on account of her race by refusing to accommodate her medical condition while accommodating the medical condition of while (sic) employees." Insofar as Smith bases this disparate treatment claim on racial motivation in failure to reasonably accommodate her ADA disability, it must necessarily fail because she has not shown that she was disabled. See Philip v. Ford Motor Co., 2002 WL 391348 (D. Minn.), *aff'd in part*, *rev'd in part*, 328 F.3d 1020 (8th Cir. 2003). It appears, however, that Smith asserts that "race motivated in part Sharpton's decision not to accommodate [her] temporary limited restrictions" imposed by Dr. Bunch. (Pl. Mem., pp. 18-19).

    Providence argues that Smith cannot establish a prima facie case of discrimination based on the following framework:

> In order to survive summary judgment under Title VII, a plaintiff must show that an employer's proffered reason for an adverse action is a pretext for discrimination. *See, Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 807, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). "To demonstrate the *prima facie* case of . . . discrimination under the pretext framework, the plaintiff must show that (1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." *Hill v. Lockheed Martin Logistics Management, Inc.*, 354 F.3d 277, 285 (4th Cir. 2004).

(Def. Mem., p. 20). The undersigned finds this framework to be large irrelevant.

It is uncontradicted in this case that Smith is African-American. She requested a return to work with temporary limited medical restrictions. Sharpton denied Smith's request, and Smith suffered an adverse employment action. There is evidence that white employees were allowed to work with medical restrictions (Nix Dep. D-151).

Providence argues that Smith did not suffer an adverse employment action because she was not terminated upon return from FMLA leave, but remained an employee who could seek another position. However, Smith's status was certainly changed, she had no position, and she was unpaid. In its reply memorandum, Providence argues that Smith cannot show that she was similarly situated to the white employees who were allowed to return to work with restrictions because she has not shown that the white employees were returning from FMLA leave. The undersigned finds this to be a distinction without a difference. Whether the white employees were returning from sick leave rather than FMLA leave is irrelevant. Thus, the undersigned finds that Smith has established a prima facie case of race discrimination.

B.     Retaliation

Smith alleges that Providence retaliated against her after she filed her EEOC charge on July 1, 2002. (Amended Complaint, ¶ 58). Providence argues that Smith cannot establish a Title VII retaliation claim because she cannot show that she was not provided another position because of her protected conduct.[6] (Def. Mem., p. 23). Smith does not respond to this argument in her brief. (Pl. Mem., pp. 18-20). Providence now argues that Smith has abandoned

---

[6]Interestingly, Providence describes this as a "post-termination" retaliation claim.

her Title VII retaliation claim. (Reply Mem., p. 8, n. 5).  This appears to be so.  Further Providence points to evidence that Smith did not apply for some positions, others were filled by the time she applied, and she has produced no evidence of the qualifications of the individuals who obtained the position in question.

    IV.    Contract Claims

        Smith alleges claims for breach of contract and breach of contract accompanied by a fraudulent act (Causes of Action 5 and 6).  Specifically, she alleges that "Providence's policies provided for corrective actions prior to termination." (Amended Complaint, ¶ 64).  Generally, she alleges "Providence's policies, practices and oral representations constitute contractual obligations that altered the presumed at-will nature of the employment relationship." (Amended Complaint, ¶ 66).

    With respect to Smith's contract claims, Providence argues it is entitled to summary judgment because: (1) her claim of violation of Providence's progressive discipline policy fails because she was not disciplined; (Def. Mem. p. 25); (2) her claim for breach of Providence's EEO policy is not recognized under South Carolina law (Def. Mem., pp. 25-26);[7] and (3) Providence complied with its leave policies. (Reply Mem., p. 10).

    South Carolina has long recognized the doctrine of employment at-will.  Pursuant to this doctrine, "a contract for permanent employment, so long as it is satisfactorily performed, which is not supported by any consideration other than the obligation or service to be performed on the one hand and wages to be paid on the other, is terminable at the pleasure of either party."  Shealy

---

[7]Smith appears to conceded that she cannot maintain her contract claims based on an alleged violation of Providence's EEO policy. (Pl. Mem., p. 22).

v. Fowler, 188 S.E. 499, 502 (S.C. 1936). Under South Carolina law, an at-will employee may be terminated for any reason or for no reason at all.  Ludwick v. This Minute of Carolina, Inc., 337 S.E.2d 213 (S.C. 1985). Under South Carolina law, employment-at-will status can be altered by promises made to an employee in policies, employee handbooks, and employee bulletins. Small v. Springs Industries, 357 S.E.2d 452 (S.C. 1987).  An employer who wishes to issue a handbook a policy as an advisory statement with no intent on being bound by it must "insert[] a conspicuous disclaimer or provision into the written document." Springs, 357 S.E.2d at 454-55.

However, the insertion of an effective disclaimer is not the end of the analysis.  An employee handbook with a conspicuous disclaimer may, nonetheless, alter an employee's at-will status where the handbook also includes mandatory language with respect to certain procedures. The handbook must be reviewed in its entirety to ascertain whether it contains enforceable promises.

In the exception to the at-will employment doctrine, an employee handbook containing mandatory statements regarding disciplinary and grievance policies may be enforced against an employer as contractual obligations in a wrongful discharge action, despite the presence of a disclaimer in the handbook which asserts it is not intended to create a contract of employment. Conner v. City of Forest Acres, 560 S.E.2d 606, 610-611 (S.C. 2002); Fleming v. Borden, Inc., 450 S.E.2d 589, 594-96 (S.C. 1994); Small v. Springs Indus., Inc., 357 S.E.2d 452 (S.C. 1987).

Generally, where a handbook contains an effective disclaimer and some mandatory language but enforcement is left to the discretion of management, there is no alteration of the employee's at-will status.  See Horton v. Darby Electric Co., Inc., 360 S.C. 58, 599 S.E.2d 456 (S.Ct. 2004) (affirming grant of summary judgment).

The record does not contain a handbook, but Smith points to various policies: (1) FMLA Approved Leave of Absence (Chapman Dep., Ex. 84); (2) Attendance (Chapman Dep., Ex. 85); (3) EEO and Antiharassment (Chapman Dep., Ex. 86); (4) Leave of Absence (Chapman Dep., Ex. 87); (5) Bereavement Leave (Chapman Dep., Ex. 92); (6) PTO (Chapman Dep., Ex. 93); and (7) Progressive Discipline & Dismissal (Chapman Dep., Ex. 94). It must be initially noted that each of these policies, except the FMLA Approved Leave of Absence policy intended to implement the FMLA, contains a separate conspicuous disclaimer which stated: "This policy in no way constitutes a contract, either express or implied, and it is not intended, in the absence of a written employment contract, to alter the employment-at-will status of a hospital employee." It should further be noted that these policies are generally written in non-mandatory terms giving discretion to supervisors.

Smith makes the following general argument:

> The whole premise of South Carolina handbook jurisprudence is that fundamental fairness prevents employers from representing one thing to its employees and then doing another when it becomes desirable to the employer. Typically, as here, when an employer promulgates a progressive discipline policy, it adopts a system under which it represents to its employees that they will not be terminated unless they engage in identified misconduct following opportunity to understand that they are not meeting the employer's expectations and have an opportunity to conform their conduct to that which is desired by the employer–except in the case of the most egregious conduct when immediate termination is appropriate. Accordingly, unless some other provision of the contract permits otherwise, the employer is bound by its representation that it will only terminate an employee for misconduct under the progressive discipline policy.

(Pl. Mem., p. 22).

Plaintiff cites no authority for this broad interpretation of handbook law in South Carolina. Further, the undersigned finds that the progressive discipline policy does not contain the necessary

23

mandatory language. For example, the policy is stated to be "a practical guideline" intended to be "a flexible system." Thus, plaintiff's argument is rejected. Further, Smith points to no other specific provision of any of the policies she has cited which she claims Providence breached. Further, she cites no evidence to support a conclusion that a breach has occurred. In essence, Smith's contract argument rests on a feeling that Providence breached fundamental fairness in its dealings with her. Such argument cannot be sustained.

V.     South Carolina Human Affairs Law

Smith asserts that Providence breached the South Carolina Human Affairs Law, S.C. Code Ann. § 1-13-10, et seq. Providence argues that most of Smith's claims under this statute are time barred. Smith concedes that her only viable claim under this theory is Providence's failure to rehire her in May of 2003. This claim relates to Smith's ADA retaliation claim.

## Conclusion

Based on a review of the record, the undersigned recommends that defendant's motion for summary judgment be denied with respect to plaintiff's FMLA claim, ADA retaliation claim, Title VII disparate treatment claim, and South Carolina Human Affairs claim relating to the May 2003 failure to rehire. It is further recommended that the motion for summary be granted in all other respects.

Respectfully submitted,

s/Joseph R. McCrorey
United States Magistrate Judge

August 19, 2005
Columbia, South Carolina